John Joseph SLATTERY, plaintiff,

v.

Robert NEUMANN, as Sheriff of Palm Beach County, Florida, Defendant.

No. 00–8991–civ.

United States District Court,
S.D. Florida.

Feb. 22, 2002.

**1368**

Karen Berg Brigham, Whelan DeMaio & Kiszkiel, Miami, FL, for John Joseph Slattery, plaintiff.

Michael George Whelan, Miami, FL, Karen Berg Brigham, Whelan DeMaio & Kiszkiel, Miami, FL, for Sheriff of Palm Beach County, Florida, Robert Neumann, in his official capacity, defendant.

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

FERGUSON, District Judge.

John Slattery ("Slattery"), a retired police sergeant, alleges a 42 U.S.C. § 1983 violation of his First Amendment free speech and Fourteenth Amendment due process rights by the Palm Beach County Sheriff's Office ("P.B.S.O"). This cause is before the Court on P.B.S.O.'s Motion for Summary Judgment [D.E. 31].

### FACTUAL BACKGROUND

Slattery's First Amendment claim is predicated on a May 1998 reassignment in employment duties from the aviation unit to an administrative post. He claims that the transfer was motivated by a March 5, 1998 complaint he made to the Federal Aviation Administration ("FAA") concerning another employee, Chief Mechanic Michael Beedy ("Beedy"), with whom he had a running dispute. In the March, 1998 report to the FAA, which predated the transfer, Slattery alleged that Beedy was falsifying aircraft maintenance records. The record reflects that the FAA complaint against Beedy was filed a few days after Beedy made a February 12, 1998 internal complaint with the unit administrator's office against Slattery. In Beedy's complaint it was alleged that Slattery attacked Beedy's personal and professional reputations constantly and often used expletives when confronting him at the workplace.[1] As Slattery concedes, "[t]he record

---

1. *See* Beedy Aff.

is silent as to whether the FAA investigated [Beedy] and silent as to the outcome of any investigation that may have been conducted".[2] Slattery alleges that prior to filing the FAA complaint he made a series of internal grievances about ongoing safety problems within the aviation unit to no avail. He alleges that a superior officer, Captain Mills, told him regarding the complaint, "if you do not let this go, I will have Internal Affairs all over your [expletive] every day of the week."[3] Slattery further asserts that Captain Mills asked that he cease voicing his displeasure with Beedy for the "good of the department".

P.B.S.O. argues that Slattery was transferred because he disobeyed a direct order from his superior not to engage in unsafe flying. Specifically, the Office of Professional Regulation ("OPR") investigated Slattery and sustained charges that he committed two unsafe maneuvers at two different locations within three hours on March 17, 1998. Slattery's infractions occurred a mere four days after his commanding officer held a unit meeting and expressly forbade such antics. While Slattery claims these charges are bogus, his unsafe flying was reported to the unit's administrative officer by five eyewitnesses including three fellow pilots and two paramedics, each of whom submitted memoranda documenting the incidents.

When describing Slattery's unsafe flying an eyewitnesses stated "I observed the helicopter come to a 5 foot hover and immediately execute an accelerated 360 [degree] left pedal turn ... [I] observe[d] the helicopter pitch nose high...."[4] Another observer wrote "[t]he aircraft then nosed over, with the tail rising up to approximately a 45 degree angle to the ground and the aircraft accelerated forward rapidly ... it would be possible for the aircraft to flip over ... an accident during this type [of] take-off would most likely result in critical/fatal injuries to all occupants of the aircraft and loss of the aircraft."[5]

This was Slattery's first incident of unsafe flying in twenty years with P.B.S.O. On May 6, 1998 OPR issued a report sustaining the eyewitnesses' allegations of unsafe flying and Slattery was transferred out of the aviation unit. As a result, he lost his right to fly a P.B.S.O. aircraft, ongoing flight training and his annual flight physical. Slattery also claims he lost overtime opportunities associated with his position as a pilot.

Police Benevolent Association ("PBA") union representatives, acting on Slattery's behalf, filed a May 22, 1998 public records request seeking the investigation documents. Slattery claims this request was ignored. On June 18, 1998 a notice of discipline for unsafe flying was issued, and signed by Slattery, which included a twenty-day suspension without pay, demotion to deputy pay grade, and a permanent transfer from the aviation unit. On July 2, 1998 Slattery gave written notice of his appeal. On July 3, 1998 the disciplinary action was retracted except as to the transfer. After the order for disciplinary action was partially withdrawn Slattery abandoned his appeal of the finding that he had engaged in unsafe flying practices.

Slattery's Fourteenth Amendment claim centers around his involvement in another incident for which he faced charges of untruthfulness. During OPR's investigation of the charges Slattery had made against Beedy for falsification of maintenance records, it was discovered that Slat-

---

2. Plf.'s Resp. to Def.'s Statement of Material Facts, p. 2.

3. Plf. Dep. p. 77.

4. Mark E. Wetherington Memo.

5. Sergeant Scott Krueger Memo.

tery lied to his superiors about reporting to the FAA. On November 3, 1998 Slattery was informed in writing that a second investigation of him had been completed and that he faced termination for lying. Slattery was scheduled for a predetermination hearing prior to any disciplinary action being taken when Police Benevolent Association ("PBA") representatives, again acting on Slattery's behalf, filed another public records request seeking investigation documents. P.B.S.O. again refused to produce its files. The PBA attorney filed a petition for writ of mandamus and the parties agreed to stay the disciplinary proceedings pending the results of the discovery litigation. On December 21, 1998 a writ of mandamus issued directing P.B.S.O. to produce all requested files. On February 14, 2000, the Fourth District Court of Appeal upheld the writ of mandamus.

Before P.B.S.O. complied with the order to produce the public records, Slattery abandoned his attempts to secure discovery documents. Rather than face possible disciplinary action or termination for untruthfulness, Slattery retired on October 1, 1999 at the age of fifty-eight and moved to Tennessee. Slattery claims that he was constructively discharged because his resignation was involuntary and secured under duress and coercion. However, when deposed Slattery described his post-transfer duties as having "no real responsibility ... [he] just came to work every day from 9:00 to 5:00, and stood around waiting for someone to hand [him] a piece of mail to deliver, or answer a phone."[6] Slattery concedes that he "never complained about all the past history and all the things that were wrong and corrupt ..."[7] before retiring. He also admits that he did not request a hearing before taking the ulti-

mate step of resigning because he "realized it was inevitable"[8] and unilaterally chose instead to retire.

## STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A factual dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Similarly, a fact is "material" if it might affect the outcome of the suit under the governing substantive law. *Anderson*, 477 U.S. at 247, 106 S.Ct. 2505.

In considering this motion for summary judgment, the Court must examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that the defendant should prevail as a matter of law." *Id.* at 243, 106 S.Ct. 2505. The movant bears the initial burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In deciding whether the movant has met this burden, the Court must view the evidence and all factual inferences in the light most favorable to the non-movant. *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1532 (11th Cir. 1992). "If reasonable minds could differ on the inferences arising from undisputed

---

6. Plf. Dep., p. 158.

7. *Id.* at P. 179.

8. *Id.*

facts, summary judgment should be denied." *Id.* at 1534.

Once the initial burden is met, the non-movant must come forward with specific facts showing that there is a genuine issue for trial that precludes summary judgment. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The evidence presented cannot consist of conclusory allegations, legal conclusions or evidence which would be inadmissable at trial. *Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir.1991). Likewise, "a mere scintilla of evidence supporting a position will not suffice; there must be enough of a showing that the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. Failure to make a showing sufficient to establish the existence of any essential element of a claim is fatal and requires the entry of summary judgment. *Celotex Corp.*, 477 U.S. at 322–323, 106 S.Ct. 2548.

### ISSUE PRESENTED

The main issue raised is whether a pilot who resigns from employment after being grounded and assigned to administrative duties with no loss of pay or benefits, following complaints and a finding of unsafe flying, may nevertheless maintain a § 1983 action based on adverse employment action.

### DISCUSSION

Both Slattery's First Amendment free speech and Fourteenth Amendment employment due process claims brought pursuant to § 1983 depend on proof that he suffered an adverse employment action—constructive discharge. P.B.S.O.'s motion for summary judgment asserts that Slattery voluntarily resigned and that no adverse employment action was taken. This Court shall first address the dispositive adverse employment issue.

### Adverse Employment Actions

Adverse employment actions are defined as those which constitute "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibility, or a decision causing a significant change in benefits." *Burlington Industs., Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 2268, 141 L.Ed.2d 633 (1998). The Eleventh Circuit has further held that employees suffer an adverse employment action if they are constructively discharged.

### Constructive Discharge

In order for a plaintiff to prove constructive discharge he must establish that "he involuntarily resigned from his employer to escape intolerable or illegal employment requirements ..." and that the "working conditions were so intolerable that a reasonable person ... would be compelled to resign." *Morgan v. Ford*, 6 F.3d 750, 755 (11th Cir.1993) (holding employee suffered no constitutional deprivation in violation of her right to free speech were she resigned after complaining of workplace harassment). However, an employee has the responsibility to act reasonably before choosing to resign, based on a theory of constructive discharge. *See Garner v. Wal–Mart Stores, Inc.*, 807 F.2d 1536, 1539 (11th Cir.1987). Reasonable conduct involves notifying the employer of improper behavior, and affording the employer an opportunity to correct the situation. *See id.*

In *Rogers, et al. v. Miller, et al.*, 57 F.3d 986 (11th Cir.1995), several police officers brought a 42 U.S.C. § 1983 claim against their former employer, the Florida Sheriff's Department. The plaintiffs alleged that during a political campaign for the office of sheriff they exercised their First Amendment rights by supporting the opponent of the incumbent sheriff. Prior to

the election, the plaintiffs filed suit alleging that the department infringed upon their First Amendment rights by taking adverse employment actions against them in retaliation for their support of the incumbent's opponent. The plaintiffs stated they were told by the defendants to "keep their political opinions to themselves until they were in the voting booth" and that "[they] were not prepared for the grief [they were] going to have ... more grief than [they] could stand" because of their political affiliations. *Id.* at 989.

After the lawsuit commenced, the sheriff was re-elected and authorized the transfer of the plaintiffs to neighboring precincts or switched them to different shifts within the same precinct so they would not be under the direct supervision of some of the named defendants. *Id.* at 990. It was undisputed that the resulting transfers did not involve demotions in pay or rank but did cause the plaintiffs hardship or loss of supervisory responsibilities. Nonetheless, the plaintiffs resigned and alleged they were constructively discharged. *See id.* at 987.

The district court dismissed the constructive discharge claims finding that the plaintiffs failed to show that their working conditions after the transfers were such that a reasonable person would have felt compelled to resign. On appeal, the Eleventh Circuit agreed holding that the warnings the plaintiffs complained of, the attempts to sway their political views, and their transfers were not actionable under § 1983 because such conduct did not constitute adverse employment action prohibited under the First Amendment. *See id.* at 992; *see also Smith v. Upson County, Ga.,* 859 F.Supp. 1504, 1510 (M.D.Ga.1994) (finding no adverse employment action because the plaintiffs suffered no loss in pay, benefits, or classification), *aff'd.,* 56 F.3d 1392 (11th Cir.1995).

In *Rogers,* the Eleventh Circuit also reversed the district court's denial of the defendants' qualified immunity claim and held that no existing case law clearly established that "a plaintiff in a § 1983 law suit may not be transferred to a position involving no loss or pay or rank ... this is particularly true in the law enforcement context, where, concerns for order, loyalty, morale and harmony are at a premium." *Id.* at 991. The court therefore held that the defendants' transfers did not constitute adverse employment action which is prohibited under the First Amendment.

 Similar to the plaintiffs in *Rogers,* Slattery failed to demonstrate that his transfer was an adverse employment action which mounts to constitutional deprivation or First Amendment retaliation. Although Slattery's job duties were different after his reassignment, he was never suspended and did not suffer a demotion or loss in pay as a result of his transfer. Rather, Slattery continued to have a take home vehicle, and with the exception of his annual pilot's physical exam and flight training, he did not lose any employment benefits. The claimed loss of a potential for overtime pay, alone, is not a substantial benefit. First, overtime pay is not a contracted for benefit and second, because of the uncertainty one would have to speculate at its value. Managerial efforts to reduce costs and increase efficiency commonly focus on the elimination or reduction of overtime pay. More important, Slattery's reassignment was for good reason, public safety, a managerial exercise of business discretion not prohibited by *Burlington, supra.* "This court does not sit as a super-personnel department that re-examines an entity's business decisions." *Alphin v. Sears, Roebuck, & Co.,* 940 F.2d 1497, 1501 (11th Cir.1991); "Title VII does not give the court the power to substitute its business judgment for that of the em-

ployer." *Webb v. R & B Holding Co., Inc.,* 992 F.Supp. 1382, 1387 (S.D.Fla.1998).

Captain Mills' threats of heightened scrutiny and a miserable work environment if Slattery continued reporting Beedy's alleged FAA violations is similar to the threats made to the Rogers plaintiffs concerning their exercise of the First Amendment. The result is the same—ominous warnings are insufficient to establish a constructive discharge in a § 1983 action. *See Rogers,* 57 F.3d at 992. In direct contrast to Slattery's claim of retaliation and constructive discharge it is uncontroverted that he received high marks and praise from his new supervisors on both his October 8, 1998 and October 8, 1999 annual reviews prior to his voluntary retirement in October, 1999.

In response to P.B.S.O.'s claim that Slattery's resignation renders him now unable to seek redress under § 1983, Slattery asserts that he was subjected to "constant humiliation and degradation" between May, 1998 and October, 1999 which was specifically intended to force his resignation. Slattery labels his work environment during this period as "emotional torture" and states that his resignation was involuntary, thus not precluding this lawsuit. It is uncontroverted, however, that Slattery made his resignation without affording P.B.S.O. an opportunity to correct the complained of intolerable work conditions. His pre-resignation actions fail the test of reasonableness necessary to a cause of action based on constructive discharge. *See Garner,* 807 F.2d at 1539.

### Employee Resignations

■ Employee resignations are presumed to be voluntary. *See Christie v. United States,* 207 Ct.Cl. 333, 518 F.2d 584 (1975). "This presumption will prevail unless [the employee] comes forward with sufficient evidence to establish that the resignation was involuntarily extracted." *Id.* at 587. There are two instances in

which an employee's resignation will be deemed involuntary: "(1) where the employer forces the resignation by coercion or duress . . .; or (2) where the employer obtains the resignation by deceiving or misrepresenting a material fact to the employee." *Hargray v. City of Hallandale,* 57 F.3d 1560, 1568 (11th Cir.1995). However "resignations can be voluntary even where the only alternative to resignation is facing possible termination for cause or criminal charges . . . [or other] unpleasant alternatives . . . because the fact remains that [the] plaintiff had a choice." *Id.* (citations omitted).

Hargray was the operations manager in the public works department and was responsible for overseeing the grounds and maintenance departments. He brought a § 1983 action claiming that the City's coercion and misrepresentations about his work violations forced him to resign in violation of his Fourteenth Amendment rights. Four employees reported to the City's personnel director that they personally observed Hargray misappropriating City property for his personal use. Hargray was informed of the internal complaints and an investigation ensued. The City's representative later informed Hargray that there was probable cause to bring grand theft charges against him but if Hargray opted to proceed with an administrative hearing and confessed to some wrongdoing they would honor his resignation. *See id.* at 1565.

When questioned during the investigation proceedings, Hargray admitted to improperly converting City property to his own use but initially indicated he would rather defend himself in a criminal action. The City investigator then stated he would leave Hargray alone to consider his options and stated "I will give you two words to think about—Sheridan Lumber", the type of City wood found in Hargray's yard. *Id.* When the investigator returned, Har-

gray changed his mind and agreed to proceed administratively. The questioning resumed and Hargray later went back to his office and wrote a resignation letter. Hargray then filed suit claiming that the City forced him to resign without a hearing because the police led him to believe that if he did not resign he would be prosecuted for grand theft. *See id.* at 1567.

■ After a non-jury trial, the district court found that the City constructively discharged Hargray because his resignation was involuntary as he did not have a realistic alternative. The district court further found that the City made misrepresentations as to the criminal consequences of not resigning. The court therefore awarded him back pay and compensatory damages. On appeal, the Eleventh Circuit reversed and identified the following factors to determine whether a resignation was obtained by coercion or duress: "(1) whether the employee was given some alternative to resignation; (2) whether the employee understood the nature of the choice he was given; (3) whether the employee was given a reasonable time in which to choose; (4) whether the employee was permitted to select the effective date of the resignation; and (5) whether the employee had the advice of counsel." *Id.* at 1568. Using these factors, the appellate court held that, under the totality of the circumstances, Hargray's resignation was not procured with coercion or duress because he was aware of the charges against him, knew the sources of the allegations, never requested more time to make a decision, and did not request to speak with a supervisor or consult an attorney. *See id.* at 1570.

The Eleventh Circuit also reversed the lower court's finding that Hargray's resignation was obtained by misrepresentation. Instead the appellate court held that Hargray could not establish that the City knew, or reasonably should have known, that the threatened criminal prosecution for grand theft could not be substantiated. *Id.* It further held that the City had probable cause to bring grand theft charges against Hargray mainly because of the eyewitness testimony regarding the misappropriation of City property for his personal use and the evidence found at Hargray's home.

In this case Slattery cannot establish that P.B.S.O.'s threatened disciplinary actions for untruthfulness could not be substantiated as he did attempt to conceal his contact with the FAA. Similar to the *Hargray* plaintiff, the activity which caused Slattery's transfer, his unsafe flying, was witnessed by several employees who made internal complaints about the infraction. Further there was an administrative finding of unsafe flying, a challenge to which was abandoned. Similar to the *Hargray* plaintiff, Slattery has attempted to characterize his voluntary resignation as a constructive discharge entitling him to damages for resulting constitutional violations. Slattery has failed, however, to overcome the presumption of voluntary resignation either by duress, coercion, or misrepresentation theories.

■ Using the *Hargray* factors to determine whether a resignation is voluntary, Slattery was knowledgeable of his alternative to resigning. While possible termination for untruthfulness may be deemed an "unpleasant" option, the fact remains that Slattery still had a choice— one which was arguably better than the *Hargray* plaintiffs' option of criminal prosecution. *Id.* at 1568. Furthermore, unlike the facts in *Hargray* Slattery was not asked to resign and was represented by counsel throughout all the employment proceedings.

■ While Slattery loosely uses terms such as "emotional torture" to describe his work environment after he was trans-

ferred from the aviation unit to an administrative post, the record lacks concrete examples of the "humiliation and degradation" to which he was subjected. Instead the record makes clear that Slattery resigned to avoid the loss of prestige he subjectively associated with being relegated to a "desk job" and not because of any objectively intolerable working conditions. A reassignment to a job that one considers relatively meaningless is not an adverse employment action especially where there was good cause for a transfer. Thus, there is insufficient evidence to establish that Slattery suffered an adverse employment action, and summary judgment should be entered in favor of the Defendant as a matter of law.

Having duly considered the motions, responses, oral arguments and pertinent parts of the record, it is

**ORDERED AND ADJUDGED** that the Defendant's Motion for Summary Judgment [D.E.31] is **GRANTED.** Accordingly, the Defendant's Motion to Dismiss [D.E. 3] and all other pending motions are hereby **dismissed as moot.**